UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

CASE NO. 06-20062
HON. LAWRENCE P. ZATKOFF

v.

ELENA SZILVAGYI,

    Defendant.
_____/

### SENTENCING OPINION

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on July 24, 2007

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

### I. INTRODUCTION

Defendant pled guilty in this Court to counts 1 and 8, which charged Defendant with conspiracy to defraud the United States, and conspiracy to commit obstruction of justice and to obstruct a criminal health care fraud investigation. For the reasons set forth below, the Court sentences Defendant to 31 months on count 1 and 31 months on count 8, to run concurrent to each other, but consecutive to the sentence she is now serving. The Court also imposes a fine of $100,000.00 and orders restitution of $7,000,000.00.

### II. SENTENCING FACTORS

When sentencing a defendant, the Court must consider the relevant factors from 18 U.S.C. § 3553, and articulate the reasons for its sentencing decision. *United States v. McBride,* 434 F.3d 470, 476 (6th Cir. 2006). The Court will now analyze the relevant factors as they relate to

Defendant

1. **The Nature and Circumstances of the Offense**

During the 1990s, Defendant was the co-owner and president of Prime Care Services, a home health care company located in Southfield, Michigan. Audits between 1997 and 2000 determined that Prime Care Services owed Medicare approximately 7.1 million dollars. Knowing that Medicare would reduce or stop reimbursements to Prime Care Services until the debt was paid, Defendant developed a plan to start other health care companies that would be owned by other people on paper, but in reality would be owned by her.

One of the new companies was Autumn Ridge Home Health Care. Jesse Cruz, a co-defendant and registered nurse and computer technician for Prime Care Services, was listed as the owner. Defendant and her father transferred $69,000 from Health Care Partners (another of Defendant's companies) to themselves and then to Cruz to fund Autumn Ridge.

On April 30, 2003, agents from the United States Department of Health and Human Services met with Cruz at his office at Autumn Ridge. According to Defendant's testimony at Cruz's trial, Cruz told the agents that Linda Ryan had performed an evaluation of Autumn Ridge to ensure that it complied with federal civil rights requirements. Ryan had in fact not performed the evaluation. After the meeting, Cruz allegedly called Defendant, told her about his conversation regarding Linda Ryan, and allegedly asked her to "fix" it. Defendant then contacted her brother Greg (Linda Ryan is Greg's sister-in-law) and Mary Ann Ryan, Linda's mother. Defendant offered to pay Linda either $250 or $1000 to tell investigators that she had done the evaluation of Autumn Ridge. Defendant then told Cruz that she made the offer.

Defendant was indicted on February 9, 2006, and pled guilty to counts 1 and 8, conspiracy

2

to defraud the United States, and conspiracy to commit obstruction of justice and to obstruct a criminal health care fraud investigation, pursuant to a Rule 11 Plea Agreement on July 13, 2006. The Rule 11 Plea Agreement provided for a sentencing range of 51 - 63 months. The Agreement provided that Defendant would cooperate with the government and testify at any proceedings. The Agreement also stated that the government would recommend a sentencing range of 24 - 30 months if Defendant provided substantial assistance. In addition, the government stated on the record that one of Defendant's parents, who are charged in a separate indictment, would be given Pretrial Diversion.

**2.      The History and Characteristics of the Defendant**

This is not Defendant's first health care fraud violation. In 2004 Defendant pled guilty to conspiracy to commit health care fraud in the Western District of Michigan. Defendant submitted cost reports to Medicare that included costs for the construction of her house. Defendant was sentenced to 48 months imprisonment, and ordered to pay $865,624.00 in restitution to the government and a $100,000.00 fine.

**3.      The Seriousness of the Offense**

Medicare fraud is an extremely serious offense. The government estimates that Medicare fraud costs the taxpayers 12 billion dollars a year. *Medicare Rules Must Cut Fraud*, SAN JOSE MERCURY NEWS, Nov. 13, 2003, at 6B. Other experts estimate the cost to be from 50 to 75 billion dollars a year. *Id.* "Perhaps no other government program is as rife with fraud as Medicare," and the extreme difficulty of detecting Medicare fraud means that benefits must be cut to offset the losses. Elizabeth Shogren, *Rampant Fraud Complicates Medicare Cures*, LOS ANGELES TIMES, Oct. 8, 2005, at A1. Thus, Medicare fraud harms both taxpayers and those who desperately need the

3

benefits that Medicare provides.

**4.      Promote Respect for the Law and Afford Adequate Deterrence to Criminal Conduct**

As noted above, Medicare fraud is extremely difficult to detect. The government relies both on honesty and the threat of criminal sanctions to prevent fraud. The Sixth Circuit has also noted that "One of the central reasons for creating the sentencing guidelines, moreover, was to ensure stiffer penalties for white-collar crime and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Davis*, 458 F.3d 491, 499 (6th Cir. 2006). In the instant case, Defendant violated the trust the government placed in her, and a significant sentence is necessary in order to promote respect for the law and afford adequate deterrence to criminal conduct.

**5.      Guideline Range**

Defendant's guideline range is 51-63 months.

**6.      Government's Motion for a Downward Departure**

The government has moved for a downward departure from the guideline range, requesting a sentence of 24 to 30 months. The government has also stated that it has no objection to Defendant serving her sentence concurrently with her current sentence. The government notes that Defendant provided substantial assistance with the prosecution of the case against a co-defendant, Jesse Cruz. The government also argues that "Defendant appears to have changed considerably from the angry, self-possessed, 'everyone is wrong but me" Defendant who all but attempted to take over the Courtroom during her first sentencing in [the Western District of Michigan] before Judge Bell."

The Court, however, does not share the government's view of Defendant's alleged transformation. During the Cruz trial Defendant frequently gave evasive, rambling, and non-

4

responsive answers. During cross-examination Defendant was uncooperative and hostile. On four separate occasions the Court had to admonish Defendant to simply answer the questions put before her without editorializing.

Defendant frequently responded to questions with sarcastic and hostile statements. The following are examples of Defendant's inappropriate statements.

> Q: And you are currently serving a four-year prison sentence in the Western District of Michigan?
>
> A: Do you always have to remind me of that?
>
> Q: Well, I apologize. But I do have to remind you of that.
>
> A: Yes, sir. I am already reminded every night when I go to bed.

Transcript of June 29, 2007 at 28.

> Q: Correct. This is the back of your home, is it not? (Showing a picture of Defendant's home, for which the costs of construction were illegally passed on to Medicare.)
>
> A: Yes. Do you know [how many] people live there?
>
> * * *
>
> Q: That is the Medicare Mansion. That is the home that the citizens of the United States paid for, true?
>
> A: Sir, I'm paying for it very dearly right now.

*Id.* at 43.

> Q: Okay. So what happened to that 8.5 million dollars that Aurora was paid, what did you do with that money?
>
> A: I thought you would never ask . . . .
>
> * * *
>
> Q: Right. You were servicing Health Care Partners and in one year you had gross

5

> revenues of 8.5 million dollars?
>
> A: Sir, remember what you said earlier. You said we provided, Aurora provided -
>
> Q: Ms. Szilvagyi, I'm sorry, but I don't think you should be asking me questions.
>
> The Court: I am going to emphasize again, we have questions and answers. And if the government wishes to bring something else out through this witness they may do so. So let's start again. I am going to ask the witness to concentrate on the question and answer it.

*Id.* at 118.

> Q. So you accused me of throwing of throwing arrows for all your bad acts, correct?
>
> A. This band reminds me I am the scum of the earth. Is that what you are saying? Yes. (The "band" refers to a wrist band that federal prisoners are required to wear when released from prison to testify at a trial.)
>
> The Court: Apparently nobody is listening to me. I want questions and answers to the questions. No editorializing. Let's start again with the questions. Let's have an answer to the question.

*Id.* at 46.

Defendant also gave evasive and non-responsive answers to questions regarding her role in the start-up of her cousin's health care agency in Hawaii, and the bankruptcy proceedings of one of her companies. Defendant also gave testimony that was highly misleading, if not downright false, regarding her earlier case in the Western District. Defendant stated that the court in the earlier case "fired" her and her husband's attorneys, and that they were unrepresented by counsel at their sentencing.

At the first sentencing hearing for Defendant and her husband in the Western District, they attempted to withdraw their guilty plea, alleging that their attorneys did not effectively represent them, and forced them to "lie." Defendants raised these concerns for the first time at the sentencing hearing. The court made the following statement to Mr. Gurewitz (Defendant's attorney) at the

6

hearing:

>The Court: Well, if I were a defendant that wanted to obstruct a federal criminal proceeding, the way I would do it is I would wait until day of sentencing, I would jump up, surprise everybody, and say ineffective assistance, wouldn't I? You were as surprised as anybody else, weren't you, a moment ago?
>
>Mr. Gurewitz: I have not seen this before, You Honor.

Hearing on June 15, 2004, Case no. 03-CR-217 at 7. The court adjourned the hearing to allow Defendant and her husband to obtain other attorneys if they wished. The court did not "fire" their attorneys. Regarding Mr. Bellamy, Defendant's husband's attorney, the court stated:

>And let me say this for the record. This Court, in permitting Mr. Bellamy the right, the privilege of continuing to represent Mr. Szilvagyi, wants to make it abundantly clear for the record that this Court finds no fault whatever in Mr. Bellamy's representation thus far. This Court has seen nothing but vigorous and able representation by a very honored and revered member of the legal community.

*Id.* at 18. Regarding Mr. Gurewitz, the court stated:

>Mr. Gurewitz, there has been more than sufficient demonstration that your client no longer wishes you to represent her. But let me once again say that this Court has seen nothing by way of representation in this Court, nothing by way of documents that his Court has reviewed, appearances, motions, and sentencing memorandums or any other matters, which would indicate to this Court that your standard of practice fell below the standard required of lawyers in this community. So nothing this Court is saying in relieving you of your responsibility should in any way be imparted or imputed that you have in any way not performed your responsibility. I want that very clear in my permitting you to withdraw your representation in this matter.

*Id.* at 32.

The court also found that Defendant and her husband were not indigent, and not entitled to court-appointed attorneys. Thus, it was their decision, and not the court's, to appear at their next sentencing hearing without counsel.

Contrary to the government's assertion that Defendant has accepted complete responsibility for her criminal actions, Defendant continues to rationalize her behavior and shift responsibly to

7

others. Defendant made the following statements during the taking of her guilty plea in this Court.

> So here – here we are. I'm a mother of this ten-year-old child, Prime Care, and they're [Medicare] starving the – the company. Because they decided after we appealed to them, say, we're going to pay you in increments. They had allowed that before, but all of a sudden they didn't allow it . . . .
>
> \* \* \*
>
> Your Honor, so then in 2000 what happened, per advice of our counsel, they felt sorry for us, so we started a home care agency called Health Care Partners, and Health Care Partners then was the one who succeeded all the employees. They hired all the employees under the ownership of Linda Jones. This is where they found us defrauding the government, your Honor. And – well, we did it because we couldn't afford to pay back the money and – and we were under appeal at that time.
>
> \* \* \*
>
> Q. And at the time that you asked Marianne Ryan to communicate this payment, this, what I will call a bribe, to Linda Ryan, did you know that it was wrong?
>
> A. You know, we're all family, and to me it was like it's within the family. At that time I really didn't look at it as that. I was just trying to help fix Jesse's problem. That's how I looked at it. And, unfortunately, it was wrong.

This pattern of behavior was repeated during Defendant's testimony in the Cruz trial. Defendant gave evasive answers regarding her responsibility for her crimes, and frequently attempted to shift the blame to others. Defendant stated that she signed cost reports with fraudulent charges, but did not know the charges were in the reports. Transcript of June 29, 2007 at 48. Defendant also stated that "I made mistakes. I trusted the wrong people, didn't I?" *Id.* at 51. Defendant also sarcastically stated on cross-examination that "I am personally liable if you want me to be." *Id.* at 75. Defendant consistently tried to avoid personal responsibility by claiming that she had been mislead by her more sophisticated advisors, and was thus liable only because she owned the company. Defendant also claimed that she felt was she was being "blackmailed" on one

8

occasion, and then withdraw the assertion after further questioning. Transcript of June 28, 2007 at 39.

As part of this effort, Defendant downplayed her expertise in the home health care industry, saying that people who called her an expert "lied." However, Defendant's testimony during her guilty plea demonstrated her expertise in home health care and Medicare procedures:

> Prime Care Services, your honor, since 1989 is a certified home health care agency. I started it with barely nothing. I worked my butt off with two jobs to support the conception of this agency. . . . The company grew. As a matter of fact, we were the largest agency in-home – as proprietarily owned in '97, '98, and '99. I believe it was 1994 we were even part of the Demo Project for Medicare because we were automated.

In the instant trial, Defendant testified that other people sought her advice regarding home health care and Medicare issues. Defendant also played a role in starting her cousin's home health care company in Hawaii, a difficult task because of that state's regulations. Defendant also sent materials to the Court detailing her many accomplishments in the home health care field.

The motivation for Defendant's attempt to revise history was revealed in correspondence she sent to the Court, where she stated that her testimony "was the trial that I never had and many times I found myself defending my own crime." Defendant did not have a trial because she pled guilty. The instant case was not a forum for Defendant to defend or explain away her earlier crimes. Defendant had a responsibility, as she was frequently reminded by the Court, to simply answer the questions put before her without editorializing. However, Defendant did not carry out this responsibility.

The Court does recognize that Defendant gave assistance to the government in this case. Thus, the Court will grant the government's motion in part.

**7.     Consecutive Sentence**

The government has stated that it has no objection to Defendant serving her sentence concurrently with her current sentence. United States Sentencing Guideline 5G1.3(c) states that:

> In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.

The Court notes that the criminal conduct underlying the instant case was not taken into consideration when Defendant was previously sentenced in the Western District of Michigan. Thus, the Court finds that a consecutive sentence is necessary to achieve a reasonable punishment for the instant offense.

**8.     Defendant's Citizenship**

In the case in the Western District of Michigan, Defendant pled guilty to conspiracy to commit medicare fraud. The conspiracy lasted from 1994 to 1998, and Defendant stipulated that the government's loss was $865,645.00. Defendant was naturalized as a United States citizen in November 1997.

Applicants for United States citizenship must be "of good moral character." 8 U.S.C. § 1101(f)(8) states that no person shall be regarded as having good moral character "who at any time has been convicted of an aggravated felony (as defined in subsection (a)(43))." Subsection (a)(43)(M)(i) defines an "aggravated felony" to include "fraud or deceit in which the loss to the victim or victims exceeds $10,000."

Although Defendant was indicted in the Western District of Michigan in 2003, her criminal conduct began in 1994, before Defendant was naturalized. Thus, Defendant's United States citizenship is subject to revocation because she was not a person of good moral character when she

applied for citizenship. *See Jean-Baptiste v. United States*, 395 F.3d 1190 (11th Cir. 2005). The Court recommends that the Bureau of Immigration and Customs Enforcement initiate proceedings to have Defendant's citizenship revoked, and to deport Defendant.

### III. CONCLUSION

For the reasons set forth above, Defendant is sentenced to 31 months on count 1 and 31 months on count 8, to run concurrent to each other. The sentences on counts 1 and 8, however, are to run consecutive to the federal sentence Defendant is currently serving. Her sentences in this case begin on the day her current sentence ends. The Court also imposes a fine of $100,000.00 and orders restitution of $7,000,000.00. The Court orders a period of supervised release of 3 years for each count, for a total of 6 years. The Court imposes the standard conditions of supervised release, and a special condition that Defendant undergo mental health testing and treatment.

IT IS SO ORDERED.

s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated: July 24, 2007

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on July 24, 2007.

s/Marie E. Verlinde
Case Manager
(810) 984-3290